# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | Case No. 1:20-cr-27-7 (KBJ) |
| **MAURICE GLASGOW,** | |
| *Defendant.* | |

## MEMORANDUM OPINION

Earlier this year, defendant Maurice Glasgow was indicted for conspiring to distribute and possess with intent to distribute fentanyl and crack cocaine. ECF No. 120 at 2–4, 7. At his initial appearance before Magistrate Judge G. Michael Harvey on April 2, 2021, Glasgow conceded detention pending trial. *See* ECF No. 117 at 2; ECF No. 122 at 2. Now, approximately two months later, Glasgow asks to be released pending trial and for an order setting the conditions of his release. ECF No. 117. The Government opposes Glasgow's motion, arguing that he would pose a flight risk and danger to the public if released. ECF No. 122 at 3. Glasgow did not reply. On June 9, 2021, the Court held a hearing on Glasgow's motion.

Upon consideration of the parties' filings, ECF Nos. 117 & 122, the arguments set forth and evidence proffered at the hearing, the applicable legal standards, and the record herein, the Court will **DENY** Glasgow's motion for pre-trial release, ECF No. 117.

# I. BACKGROUND

## A. The Investigation

The Government proffers the following evidence in support of Glasgow's pre-trial detention.[1] In Spring 2020, law enforcement began investigating a drug-trafficking organization operating in the Shaw neighborhood of Washington, D.C. ECF No. 122 at 4. From May 2020 to September 2020, law enforcement focused specifically on the Second Northwest Cooperative Apartments ("the Northwest Apartments") in Shaw. *Id.* Through physical and video surveillance, officers repeatedly observed subjects of the investigation engaging in narcotics transactions. *Id.* Some of these transactions occurred in plain sight. Gov't Proffer at Mot. Hr'g. Law enforcement conducted a number of undercover drug buys from the subjects as well. ECF No. 122 at 4.

Glasgow was one of the subjects of this investigation. *Id.* On multiple occasions, officers observed Glasgow at the Northwest Apartments with other subjects of the investigation. *Id.* Law enforcement also observed Glasgow with his co-defendants at times when his co-defendants were dealing drugs in plain sight. *Id.*; Gov't Proffer at Mot. Hr'g.

### i.   Glasgow's Suspected Arms Dealing

Based on evidence collected during the investigation, law enforcement obtained a warrant to search Glasgow's Instagram account. ECF No. 122 at 6. A search of the account revealed that, beginning in February 2020, Glasgow conversed with other Instagram users about the sale of firearms, ammunition, and magazines. *Id.* On approximately May 9, 2020, Glasgow messaged an Instagram account tied to co-defendant Jaden Smith about the sale of a firearm and ammunition.

---

[1] At the time the Court issued this Memorandum Opinion, a transcript of the June 9, 2021 detention hearing was not yet available. Factual proffers made at the detention hearing will be cited as "Gov't Proffer at Mot. Hr'g."

*Id.* at 6.[2] That same day, Glasgow also messaged another co-defendant to connect him with a third party and tell the co-defendant the address where he could go to purchase a gun. Gov't Proffer at Mot. Hr'g. One week later, on approximately May 15, 2020, Glasgow sent a photograph of nine firearms to other Instagram accounts—including to an account associated with co-defendant Jovanta Little—with the message "37 gap and 31's on the market." *Id.* at 7.[3] Officers understood Glasgow's message to be advertising firearms and ammunition for sale. *Id.* Based on Glasgow's conversations, law enforcement suspected that Glasgow was selling "ghost guns," i.e., privately manufactured firearms. *Id.*

Roughly one week after Glasgow advertised the firearms and ammunition to co-defendant Little and several other Instagram users, Glasgow was stopped by officers and found with a gun. ECF No. 122 at 10. At the time, Glasgow was under supervised release on a pending charge in the Superior Court of the District of Columbia for carrying a pistol without a license. *Id.*; *see* ECF No. 104 at 4. By possessing a firearm, Glasgow violated his condition of pre-trial release that he not possess "any firearm or ammunition." ECF No. 104 at 4.

Later that summer, law enforcement located videos on Instagram and YouTube showing Glasgow and his co-defendants with guns. First, on approximately July 13, 2020, officers located a music video posted on YouTube that featured several of Glasgow's co-defendants holding firearms and dollar bills. *Id.* Glasgow also appeared in the music video, holding "a pistol with a drum magazine." *Id.* Not long after the music video was posted, law enforcement observed a video posted by the Instagram account linked to Glasgow. *Id.* at 5. The video captured one of Glasgow's

---

[2] On May 13, 2020, Glasgow and co-defendant Smith also discussed how much to charge for a pound of "huff," which law enforcement understood to mean marijuana. *Id.*

[3] In its opposition to Glasgow's motion, the Government states that Glasgow sent a photograph to other Instagram users showing "multiple types of firearms." ECF No. 122 at 7. At the hearing, the Government clarified that the photograph showed nine guns. Gov't Proffer at Mot. Hr'g.

co-defendants "holding a firearm with [a] drum magazine tucked into his waist band [sic]." *Id.* The co-defendant (Isaiah Anderson) then "pull[ed] the firearm" out of his waistband, thereby exposing "what appears to be an 'AR' style assault rifle." *Id.* As a result of its investigation, law enforcement recovered a number of firearms from Glasgow's co-defendants, including "AR style rifles and drum magazines." *Id.* at 5–6.

### ii. Glasgow's Purchase of the Infiniti Q60

The next month, on or about August 5, 2020, Glasgow visited a car dealership in Virginia with co-defendant Anderson and a third individual. ECF No. 122 at 7. According to a witness at the dealership, Glasgow and co-defendant Anderson inquired about purchasing an Audi for $45,000. *Id.* Anderson offered to pay $20,000 up front and finance the rest, but Glasgow (who was buying the car in his name) could not obtain financing. *Id.* Instead, Glasgow and Anderson decided to purchase an Infiniti Q60 for $32,690. *Id.* at 8. The two men "paid for the vehicle with a black plastic bag filled with U.S. Currency—mostly $5 and $10 bills." *Id.* At the time of purchase, Glasgow represented that he worked for "Prince Security Services." *Id.* Later, when the Metropolitan Police Department ("MPD") contacted Prince Security Services, the company represented that Glasgow had not worked there "for some time." *Id.* Law enforcement also discovered that Glasgow had no recent wages. *Id.* Anderson too did not have any "verified employment [that] would provide such a large amount of cash." *Id.* Because Glasgow paid for the car in $5 and $10 bills despite not having any verified employment, law enforcement suspected that the vehicle was purchased with drug-trafficking proceeds. *Id.*

The day after Glasgow and co-defendant Anderson purchased the vehicle, officers observed Anderson and another co-defendant (Taquan Canarte) getting into the car. *Id.* One week later, on August 12, 2020, co-defendants Anderson and Michael Robinson were driving in the

Infiniti when they ran a stop sign and struck an MPD cruiser. *Id.* The collision rendered both vehicles inoperable, and co-defendants Anderson and Robinson fled the scene on foot. *Id.* They were apprehended by officers shortly thereafter. *Id.* A search of the Infiniti revealed the following: "a Glock 30 Gen 4 .45 caliber firearm" loaded with eleven rounds in the magazine and one round in the chamber; a digital scale; "empty zips"; a "baggie containing loose white rock," which a drug analysis later revealed to contain crack cocaine; approximately $3,567; forty-seven grams of marijuana; an additional roughly twenty-two grams of crack cocaine; and approximately twenty grams of a substance containing fentanyl. *Id.* at 8–9.

## B. Indictment & Arrest

On February 16, 2021, a grand jury returned a thirty-count Superseding Indictment charging Glasgow and thirteen co-defendants with offenses stemming from the group's alleged trafficking of fentanyl, crack cocaine, and oxycodone between June 2019 and February 2021. ECF No. 120. The Superseding Indictment charges all defendants, including Glasgow, with conspiring to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl and a mixture and substance containing a detectable amount of cocaine base ("crack cocaine"), in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(vi) & 841(b)(1)(C). *Id.* at 2–7. In addition to the overarching conspiracy charge, the Superseding Indictment also charges many of Glasgow's co-defendants with possessing with intent to distribute fentanyl, crack cocaine, or Oxycodone. *See* ECF No. 120. It further alleges that six of Glasgow's co-defendants used, carried, and possessed a firearm during a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1). *See id.*

On the same day the grand jury returned the Superseding Indictment, an arrest warrant for Glasgow issued. ECF No. 122 at 9. Three weeks later, on March 9, 2021, a Pennsylvania State

Police officer stopped Glasgow for a traffic violation outside of Reading, Pennsylvania. *Id.* Glasgow told the officer that he was driving from the Virginia/Washington, D.C. area to Manhattan, New York. *Id.* He said that he planned to go shopping and stay at a hotel for one night, but he could not recall the name of the hotel. *Id.* When asked why he was "way off route" from the drive between Washington, D.C. and Manhattan, Glasgow said that he "wanted to avoid tolls." *Id.* Glasgow consented to a search of the vehicle, which turned up $15,000 in cash. *Id.* Law enforcement arrested Glasgow pursuant to the warrant. *Id.* at 2.

At his initial appearance in the Eastern District of Pennsylvania before Magistrate Judge Henry S. Perkin, the Government orally moved for Glasgow's pre-trial detention. *Id.* Magistrate Judge Perkin ordered Glasgow detained, and Glasgow was transported to this District. *Id.* On April 2, 2021, Glasgow appeared before Magistrate Judge G. Michael Harvey. *Id.* At that hearing, Glasgow (who had counsel) did not contest his pre-trial detention and reserved the right to do so at a later time. *Id.*

## C. Glasgow's Motion for Pre-Trial Release

Glasgow now asks to be released while he awaits trial. ECF No. 117. He argues that he would not pose a danger to the community if released because he has no prior convictions, no history of violence, and only one pending criminal case. ECF No. 117 at 7. He also claims that he is not a flight risk because he has no passport and has lived with his mother in Washington, D.C. nearly his entire life. *Id.* at 8. In support of his motion more generally, Glasgow points out that he has been charged with conduct less serious than that of his co-defendants and that the Superseding Indictment does not attribute any amount of fentanyl or crack cocaine to him personally. *Id.* at 7. In fact, he says, while many of his co-defendants are alleged to have possessed a controlled substance with intent to distribute, law enforcement never found him with drugs "on his person, in

his home, or anywhere else." *Id.* at 1–2. Instead, he says, the only evidence of his involvement in the conspiracy is the fact that law enforcement found narcotics in a vehicle registered in his name, images on social media picturing Glasgow "with what appears to be a firearm," and the fact that he lives "in proximity to the area" in which the Government alleges that the drug conspiracy operated. *Id.* at 8. Glasgow also represents that he has experienced depression and suicidal thoughts while in custody. *Id.* A report from Pre-Trial Services confirms the same. ECF No. 104 at 2. Glasgow asks to return home to live with his mother "under any conditions of release that the Court deems appropriate." ECF No. 117 at 6.

The Government opposes Glasgow's motion. ECF No. 122. It first argues that the Bail Reform Act, 18 U.S.C. § 3142(e)(3)(A), establishes a rebuttable presumption that no conditions or combination of conditions would reasonably assure Glasgow's appearance as required and protect the public. *Id.* at 2. And, it says, given Glasgow's "actions showing a concerning escalation of conduct, access to large amounts of U.S. Currency, and an inability to abide by conditions of release," no conditions of release would suffice. *Id.* at 11.

Glasgow did not reply. The Court held a hearing on the motion, at which both parties proceeded by proffer. Glasgow's motion is now ripe for consideration.

## II. LEGAL STANDARDS

In our society, "liberty is the norm" and "detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, thus authorizes the detention of defendants awaiting trial on a federal offense only under certain, limited circumstances. *See* 18 U.S.C. § 3142(f). First, the government may seek a defendant's pre-trial detention if the offense charged falls into any of five enumerated categories. *Id.* at § 3142(f)(1). Relevant here, one of those enumerated categories is for offenses

"for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*)." *Id.* at § 3142(f)(1)(C). Second, the government may also seek pre-trial detention—or the court may *sua sponte* hold a detention hearing to determine whether detention is appropriate—if the case involves "a serious risk" that the defendant will flee or "will attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." *Id.* at § 3142(f)(2).

If the Bail Reform Act authorizes pre-trial detention, a judicial officer must hold a hearing to determine whether there are conditions of release that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community. 18 U.S.C. § 3142(f). At the hearing, both parties may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1209–10 (D.C. Cir. 1996). If, after the hearing, the judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer *shall* order the defendant detained pending trial. 18 U.S.C. § 3142(e)(1). A finding that no condition or combination of conditions would reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence. *Id.* at § 3142(f). And a finding that no conditions would reasonably assure the defendant's appearance as required must be supported by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

In some cases, the Bail Reform Act establishes a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of any other person and the community. *See* 18 U.S.C. § 3142(e). Relevant here, § 3142(e)(3)(A) provides that "it shall be presumed that no condition or combination of conditions

will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" an "offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*)." 18 U.S.C. § 3142(e)(3)(A).

Once this presumption is triggered, "it imposes a burden of production on the defendant 'to offer some credible evidence contrary to the statutory presumption.'" *United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)). In other words, to rebut the presumption, the defendant must produce credible evidence showing that he would not endanger the community or flee if released. *Id.* The defendant's burden of production is not heavy, but he must still introduce some relevant evidence. *Id.*

If the defendant meets his burden of production, the presumption "does not disappear entirely." *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017) (citing *United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2001)); *accord United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2020). Instead, the presumption of pre-trial detention becomes a "factor to be considered by the Court amongst the others in determining whether the defendant should be detained." *Ali*, 793 F. Supp. 2d at 388. Although the burden of production may shift, the burden of persuasion remains with the government throughout the detention proceedings. *Cherry*, 221 F. Supp. 3d at 32.

To decide whether there are conditions that would reasonably assure the defendant's appearance as required and the safety of any other person and the community, the Bail Reform Act requires courts to consider four factors set forth in § 3142(g):

> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

> **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> **(B)** whether, at the time of the current offense of arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

If a magistrate judge orders a defendant detained pending trial, the defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The motion shall be decided promptly. *Id.* The court having original jurisdiction of the offense reviews the magistrate judge's order of detention *de novo* as to issues of both law and fact. *Hunt*, 240 F. Supp. 3d at 132–33.

With these standards in mind, the Court turns to Glasgow's motion.

## III. ANALYSIS

### A. The Bail Reform Act Authorizes the Government to Seek Glasgow's Pre-Trial Detention and Establishes a Rebuttable Presumption of Detention

The Government correctly argues that it may seek Glasgow's pre-trial detention under 18 U.S.C. § 3142(f)(1)(C). *See* ECF No. 122 at 1. Section 3142(f)(1)(C) applies in cases that involve "an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act (21 U.S.C. § 801 *et seq.*)[.]" 18 U.S.C. § 3142(f)(1)(C). Here, Glasgow has been charged with conspiring to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl and a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 846 &

841(a)(1). ECF No. 120 at 2–4, 7. Under the Controlled Substances Act, those who conspire to commit an offense "[s]hall be subject to the same penalties as those prescribed for the offense" itself. 21 U.S.C. § 846. If convicted on the conspiracy charge, then, Glasgow will be subject to the penalties prescribed for the underlying offenses: distributing and possessing with intent to distribute fentanyl and crack cocaine in violation of 21 U.S.C. § 841(a)(1). As for the fentanyl offense, the Controlled Substances Act sets a maximum sentence of life imprisonment. *Id.* at § 841(b)(1)(A)(vi). And as for the crack-cocaine offense, the Act prescribes a mandatory term of twenty years' imprisonment. *Id.* at § 841(b)(1)(C). Thus, because this case involves "an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act," the Government may seek Glasgow's pre-trial detention. 18 U.S.C. § 3142(f)(1)(C).

As both parties agree, the Bail Reform Act also establishes a rebuttable presumption that no condition or combination of conditions of release would reasonably assure Glasgow's appearance as required or the safety of the community. *See* ECF No. 117 at 9; ECF No. 122 at 2. Under 18 U.S.C. § 3142(e)(3)(A), there shall be a rebuttable presumption of pre-trial detention where "the judicial officer finds that there is probable cause to believe that the person committed . . . an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*)[.]" 18 U.S.C. § 3142(e)(3)(A). Here, a grand jury found probable cause to believe that Glasgow conspired to distribute and possess with intent to distribute fentanyl and crack cocaine in violation of 21 U.S.C. §§ 846 & 841(a). ECF No. 120 at 2–4, 7. As explained above, Glasgow could serve up to life imprisonment if convicted of this offense. *See* 21 U.S.C. §§ 846, 841(b)(1)(A)(iv). An "indictment alone [is] enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community."

*Smith*, 79 F.3d at 1210; *accord United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017). Thus, the Court must presume that no condition or combination of conditions of release would reasonably assure Glasgow's appearance as required or the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). To rebut this presumption, Glasgow must "offer some credible evidence" that he would not endanger the community or flee if released. *Cherry*, 221 F. Supp. 3d at 32. For the reasons explained in the section that follows, the Court finds that Glasgow has not met his burden of production.

### B.  Glasgow Has Not Produced Evidence Sufficient to Rebut the Presumption of Detention

Glasgow proffers the following evidence to rebut the presumption that there are no conditions of release that would reasonably assure his appearance and the safety of the public: (1) he does not have a passport; (2) he has lived with his mother in Washington, D.C. nearly his entire life; (3) he has no prior criminal convictions and no history of violence; (4) he graduated from high school and has completed several college-level courses; (5) he is the father of a one-year-old child; (6) he has experienced depression and suicidal thoughts while in jail; (7) he was never observed by law enforcement engaging in suspected drug transactions; and (8) he was never found with any weapons or drugs on his person. ECF No. 117 at 7–8.

Taken together, the Court finds that this evidence does not rebut the presumption that no condition or combination of conditions of release would reasonably assure his appearance and the safety of the community. As to his flight risk, the fact that Glasgow does not have a passport certainly mitigates his risk of fleeing internationally, but it does not stop him from fleeing within the United States. Nor is his risk of flight mitigated by the fact that he has spent most of his life in Washington, D.C. and has connections to family here. Those connections have not prevented Glasgow from leaving D.C. in the past—he was arrested for the conspiracy charge in Reading,

Pennsylvania, roughly 150 miles from D.C.—and Glasgow proffers no evidence suggesting that his ties to the area will prevent him from leaving again in the future. ECF No. 122 at 9; *see United States v. Holland*, 922 F. Supp. 2d 70, 72 (D.D.C. 2013) (holding that a defendant's "connections to family and the local community" were "not nearly enough to rebut the statutory presumption of detention"). Glasgow's education level too does not mitigate his flight risk. As defense counsel clarified at the hearing, Glasgow was unemployed at the time of his arrest in March 2021.[4] Without a job to return to if released pending trial, Glasgow's education level does nothing to prevent his risk of flight.

As for Glasgow's dangerousness, the fact that law enforcement never seized drugs from him or observed him personally selling drugs does not mean he would not pose a danger to the community if released. Glasgow was not charged with *personally* distributing fentanyl and crack cocaine. *See* ECF No. 120 at 2–4, 7. Instead, the Government alleges that he *conspired with others* to distribute narcotics by purchasing a car used to transport fentanyl and crack cocaine and by advertising the sale of firearms and ammunition to his co-defendants while they were dealing drugs. *See* ECF No. 122 at 4–9. In other words, Glasgow's dangerousness comes from his history of facilitating the trafficking of fentanyl and crack cocaine, not from his history of personally selling drugs. So the fact that the Government never caught Glasgow with any drugs does not rebut the presumption of dangerousness.

Glasgow also claims that he is not dangerous because the Government never recovered any weapons from him. ECF No. 117 at 8. That is not true. On May 26, 2020, while he was under supervision pending trial on a separate firearm charge in D.C. Superior Court, Glasgow was

---

[4] At the hearing on Glasgow's motion, defense counsel initially misrepresented to the Court that Glasgow was employed at the time of his arrest for the conspiracy charge. When the Court asked defense counsel where Glasgow was employed at the time of his arrest, defense counsel clarified that Glasgow was *not* employed at the time of his arrest and was last employed before the COVID-19 pandemic began.

stopped and found in possession of a firearm and ammunition. ECF No. 122 at 10; ECF No. 104 at 4. Thus, in the face of this evidence, Glasgow's mere representation that he has not been caught with a gun cannot rebut the presumption of dangerousness.

One fact does help chip away at the presumption: Glasgow has no prior criminal convictions. ECF No. 117 at 7; *see* ECF No. 104. But given Glasgow's past willingness to possess a firearm and ammunition in violation of his pre-trial supervision for a separate firearm charge, his clean record alone is insufficient to rebut the presumption that he would pose a danger to the public if released. For these reasons, the Court finds that Glasgow has not produced sufficient credible evidence to rebut the Bail Reform Act's presumption that no condition or combination of conditions would reasonably assure his appearance and the safety of the public.

## C. Even if Glasgow Had Met His Burden of Production, the Bail Reform Act Would Still Require Pre-Trial Detention

Even if Glasgow had produced sufficient evidence to rebut the presumption of detention, the Court would nevertheless hold that he must be detained pending trial. After considering the factors set forth in 18 U.S.C. § 3142(g), as well as the presumption in favor of detention, the Court finds that no condition or combination of conditions would reasonably assure Glasgow's appearance as required or the safety of the community. *See* 18 U.S.C. § 3142(f); *Hunt*, 240 F. Supp. 3d at 132–33 (recognizing that if a defendant meets his burden of production, the presumption of detention does not "disappear entirely" but rather "remains a factor to be considered among those weighed by the district court") (quoting *Stone*, 608 F.3d at 945). In the sections that follow, the Court will first assess dangerousness and will then consider flight risk.

a. The Court Finds, by Clear and Convincing Evidence, that Glasgow Would Pose a Danger to the Community if Released Pending Trial

To decide whether any condition or combination of conditions of pre-trial release would "reasonably assure the safety of any other person and the community," the Court considers the four factors set forth in § 3142(g).

i. *Nature and Circumstances of the Offense Charged*

The Superseding Indictment charges Glasgow with one count of conspiring to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl and a mixture and substance containing a detectable amount of crack cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(vi) & 841(b)(1)(C). ECF No. 120 at 2–4, 7. The serious nature of the offense charged strongly suggests that Glasgow would pose a danger to the public if released. Indeed, the Bail Reform Act explicitly recognizes offenses involving a "controlled substance" as serious in nature. *See* 18 U.S.C. § 3142(g)(1). And the drug crime charged here is no mere low-level offense. If convicted, Glasgow could be sentenced to up to life imprisonment. *See* 21 U.S.C. §§ 846 & 841(b)(1)(A)(vi). This severe punishment reflects the serious nature of the offense with which Glasgow has been charged.

The significant quantity of fentanyl found in the Infiniti that Glasgow purchased further indicates that Glasgow's release would pose a danger to the public. Though the Government did not proffer information about the purity rate of the twenty grams of fentanyl found in the Infiniti after the collision, this quantity is substantial. For a dose of just two *milligrams* of fentanyl is lethal. *See* United States Drug Enforcement Administration, *More Than Three Million Lethal Doses of Fentanyl Seized in Minnesota Last Year*, https://www.dea.gov/press-releases/2021/03/18/more-three-million-lethal-doses-fentanyl-seized-minnesota-last-year (last visited June 10, 2021) (hereinafter "DEA Article"). This means that even if the twenty grams of fentanyl in the Infiniti

had a purity rate of only 1%, the substance would still contain *100 lethal doses* of the drug. So although Glasgow did not personally sell fentanyl to customers, he endangered the community by facilitating the trafficking of a significant quantity of this highly lethal drug.

### ii. Weight of the Evidence

Not only has Glasgow been charged with a serious offense, but the weight of the evidence of his participation in the drug-trafficking conspiracy is strong.[5] The most damning evidence is Glasgow's purchase of the Infiniti Q60 with co-defendant Anderson. In early August 2020, Glasgow and co-defendant Anderson visited a car dealership in Virginia. ECF No. 122 at 7. According to a witness at the dealership, Glasgow purchased an Infiniti Q60 for $32,690. *Id.* The two men paid for the vehicle with a black plastic bag filled with cash, mostly $5 and $10 bills. *Id.* When purchasing the car, Glasgow said that he worked for Prince Security Services. *Id.* But law enforcement discovered that Glasgow had no recent wages. *Id.* And when the Metropolitan Police Department ("MPD") contacted Prince Security Services to confirm Glasgow's employment, the company stated that Glasgow had not worked there "for some time." *Id.* Nor did Anderson "have any verified employment [that] would provide such a large amount of cash." *Id.*

One week later, co-defendants Anderson and Michael Robinson ran a stop sign in the Infiniti and struck an MPD cruiser. *Id.* The collision rendered both vehicles inoperable and the two co-defendants fled the scene on foot. *Id.* They were apprehended shortly thereafter, and officers searched the car. *Id.* The search revealed "a Glock 30 Gen 4 .45 caliber firearm" loaded with eleven

---

[5] Courts in other Circuits have "cautioned that a district court assessing the weight of the evidence must not consider the evidence of defendant's *guilt*, but rather must consider only the weight of the evidence of the defendant's *dangerousness*." *Hunt*, 240 F. Supp. 3d at 134 (emphases added); *see Stone*, 608 F.3d at 948; *United States v. Gebro*, 948 F.2d 1181, 1121 (9th Cir. 1991). Even under this standard, however, the Court's analysis would be the same. Because Glasgow has been charged with an inherently dangerous crime (conspiring to distribute and possess with intent to distribute fentanyl and crack cocaine), the evidence proffered by the Government in support of the conspiracy charge is probative of his dangerousness.

rounds in the magazine and one round in the chamber; a digital scale; "empty zips"; a "baggie containing loose white rock" that a drug analysis later revealed to contain crack cocaine; approximately $3,567 in U.S. Currency; forty-seven grams of marijuana; an additional roughly twenty-two grams of crack cocaine; and approximately twenty grams of a substance containing fentanyl. *Id.* at 8–9.

Though Glasgow was not in the Infiniti at the time of the collision, the events leading up to the crash—as well as the evidence discovered in the car after the crash—strongly suggest that Glasgow purchased the car in his name so that it could be used to traffic drugs. Tellingly, Glasgow purchased the car with more than $30,000 in cash despite the fact that neither Glasgow nor co-defendant Anderson had any lawful source of income. ECF No. 122 at 8. This lack of employment, coupled with the denomination of the bills (mostly fives and tens), suggests that Glasgow and Anderson purchased the Infiniti with drug-trafficking proceeds. ECF No. 122 at 9. Moreover, the fact that officers found twenty grams of fentanyl, twenty-two grams of crack cocaine, a scale, a loaded Glock, and over $3,500 in cash in the Infiniti strongly suggests that Glasgow's co-defendants were trafficking drugs, not just possessing them for their personal use. *See United States v. Morris*, 977 F.2d 617, 622 (D.C. Cir. 1992) (recognizing that "indicia of a drug trafficking operation" include "the quantity, composition and packaging of the drugs, the presence of drug paraphernalia, weapons, and large amounts of cash . . . and the well-nigh universal use of guns to protect such operations").

The Government also claims that Glasgow was selling firearms and ammunition to his co-defendants at the time they were dealing drugs. ECF No. 122 at 4–7. In support of this allegation, it proffers the following evidence:

- On or about May 9, 2020, Glasgow engaged in a conversation via Instagram with an account tied to co-defendant Jaden Smith about the sale of firearms and ammunition. ECF No. 122 at 6.

- Also on or about May 9, 2020, Glasgow messaged another co-defendant to connect him with a third party and tell the co-defendant the address where he could go to purchase a gun. Gov't Proffer at Mot. Hr'g.

- On or about May 15, 2020, Glasgow sent a photograph of nine firearms to co-defendant Jovonta Little with the message: "37 gap and 31's on the market." ECF No. 122 at 7; Gov't Proffer at Mot. Hr'g. "Right after" sending the messages, Glasgow followed up with video calls. Gov't Proffer at Mot. Hr'g.

- During its investigation, law enforcement recovered "a number of firearms" from Glasgow's co-defendants, including "AR style rifles and drum magazines." ECF No. 122 at 5–6.

- Glasgow knew that his co-defendants were dealing narcotics at the time he advertised guns and ammunition for sale to them, because law enforcement repeatedly observed Glasgow in the same location as his co-defendants when the co-defendants were openly selling drugs to buyers. Gov't Proffer at Mot. Hr'g; ECF No. 122 at 4.

When pressed at the hearing, however, the Government was unable to proffer any evidence that Glasgow *actually sold* firearms to his co-defendants. And without evidence showing that Glasgow actually sold guns to his co-defendants while they were trafficking drugs, evidence of his Instagram conversation discussing *potential* firearm sales to co-defendants does not add much to the weight of the evidence of his guilt. Still, even without evidence that Glasgow sold guns to his co-defendants while they were dealing drugs, the Court finds that Glasgow's purchase of the Infiniti Q60 is strong evidence of his participation in the drug-trafficking conspiracy. *See United States v. Raymundi-Hernandez*, 984 F.3d 127, 139 (1st Cir. 2020) (holding that "a defendant may be deemed part of a [§ 846 drug-trafficking] conspiracy even if he only participates in ancillary functions, such as communications, accounting, or enforcement, as opposed to more central functions like collecting, handling, or selling drugs").

To downplay the weight of the evidence against him, Glasgow argues that he was never actually observed selling drugs or caught with drugs on his person. ECF No. 117 at 7–8. If he were charged with distributing or possessing with intent to distribute fentanyl and crack cocaine, the absence of that evidence would make the case against him weak. But Glasgow was not charged with *personally* possessing with intent to distribute any controlled substances; he was charged with conspiring with others to do so. *See* ECF No. 120 at 2–4, 7. And, as explained above, Glasgow's purchase of the Infiniti Q60 is strong evidence of his participation in the conspiracy. The weight of the evidence thus further suggests that Glasgow's pre-trial release would pose a danger to the community.

### iii. History and Characteristics of the Defendant

Glasgow's history and characteristics neither weigh in favor nor against his pre-trial release. On one hand, Glasgow has no prior criminal convictions, which weighs against a finding of dangerousness. ECF No. 117 at 7; ECF No. 104. On the other hand, Glasgow has displayed a willingness to possess a firearm when ordered by a court not to do so. On November 11, 2019— several months before the drug-conspiracy investigation even began—Glasgow was stopped with co-defendant Little and another individual. ECF No. 122 at 10. Officers located two firearms in the vehicle, which Glasgow later admitted were his. *Id.* Glasgow was charged with carrying a pistol without a license in Superior Court for the District of Columbia, released pending trial under supervision, and instructed not to possess any firearms or ammunition. *Id.*; *see* ECF No. 104 at 4. But while under supervision for that charge, Glasgow was again stopped on May 26, 2020, and found with a firearm and ammunition in violation of his terms of supervision. *Id.* at 10. So although Glasgow has not been convicted of any crimes, his willingness to violate his conditions of pre-trial

release by possessing a firearm suggests that he would not abide by court-ordered conditions imposed to keep the public safe.

Glasgow's other characteristics do not affect the inquiry. Glasgow is twenty-six years old and has lived with his mother in Washington, D.C. most of his life. ECF No. 117 at 6. He graduated from high school in 2013 and left his hometown to play football at several junior colleges in South Carolina, Iowa, and Pennsylvania. *Id.* Glasgow did not finish his undergraduate degree, but says he hopes to someday apply his college credits to a local school. *Id.* At one point before the pandemic, Glasgow worked as "a Special Police Officer" and was "stationed at area homeless shelters." *Id.* Glasgow is the father of a one-year-old son and reports that the "separation from his family during his detention has been particularly difficult." *Id.* He has also suffered from depression and, as indicated by the most recent Pre-Trial Services report, has experienced suicidal thoughts while in jail. *Id.*; ECF No. 104 at 2.

None of this information says anything about whether Glasgow would pose a danger to the public if released. Many of these facts—including Glasgow's family ties and education level—were true at the time of his alleged participation in the drug-trafficking conspiracy. Nor does the fact that Glasgow was employed at some point *before* the pandemic (i.e., before his involvement in the alleged conspiracy) weigh in Glasgow's favor. Glasgow was unemployed at the time of his arrest and proffers no evidence suggesting that he has a job to return to if released pending trial. Finally, when the Court raised the issue of Glasgow's mental health with defense counsel at the hearing, defense counsel represented that his conversations with Glasgow have not raised concerns about his mental state.

On balance, then, Glasgow's history and characteristics do not move the needle either way.

*iv.  Nature and Seriousness of the Danger Posed by the Defendant's Release*

The last § 3142(g) factor—the nature and seriousness of the danger posed by Glasgow's release—weighs strongly in favor of pre-trial detention. Glasgow has been charged with conspiring to possess with intent to distribute two incredibly dangerous substances: fentanyl and crack cocaine. ECF No. 120 at 2–4, 7. Both drugs are categorized by the Controlled Substances Act as "Schedule II" substances due to their "high potential for abuse." 21 U.S.C. § 812(b)(2)(A). Fentanyl, a synthetic opioid, is "50 to 100 times more potent than morphine" and "50 times more potent than heroin." *Centers for Disease Control and Prevention*, Opioid Overdose, https://www.cdc.gov/drugoverdose/opioids/fentanyl.html (last visited June 10, 2021) (hereinafter "Opioid Overdose"); DEA Article, *supra*. Although the Court is not aware of the purity rate of the twenty grams of fentanyl found in the Infiniti, a purity rate of only 1% would mean that Glasgow's co-defendants were transporting 100 lethal doses of the drug. *See* DEA Article, *supra*. Cocaine likewise poses a serious risk to those who use it. In 2018, 14,666 people died from overdoses involving cocaine. DEA Article, *supra*. The harm caused to communities plagued with fentanyl and crack-cocaine trafficking cannot be understated.

The Government also proffers evidence that Glasgow advertised firearms and ammunition for sale to his co-defendants at a time he knew they were dealing drugs. *See* ECF No. 122 at 6–7; Gov't Proffer at Mot. Hr'g (explaining that Glasgow was observed at locations with his co-defendants while the co-defendants were dealing drugs in plain sight). Though the Government has no proof of any actual sales, and though the Court finds that his Instagram conversations are not strong evidence of his guilt, Glasgow's willingness to sell guns and ammunition to drug dealers adds to the danger posed by his release. Not only does Glasgow's willingness to sell guns to known drug dealers display a flagrant disrespect for the law, but it also shows that Glasgow is willing to

put firearms in the hands of an incredibly dangerous group of people. *See Muscarello v. United States*, 524 U.S. 125, 132 (1998) (recognizing the "dangerous combination" of "drugs and guns") (quoting *Smith v. United States*, 508 U.S. 223, 240 (1993)).

In sum, after considering the § 3142(g) factors, the Court finds, by clear and convincing evidence, that Glasgow would pose a danger to the public should he be released pending trial.[6] *See* 18 U.S.C. § 3142(f). Specifically, it finds that Glasgow would pose a danger to the community by continuing to facilitate the trafficking of fentanyl and crack cocaine in the Washington, D.C. area. *See Munchel*, 991 F.3d at 1283 (holding that pre-trial detention on the basis of dangerousness is appropriate only when there is "an articulable threat posed by the defendant to an individual or to the community" and recognizing that the "threat of dealing drugs" can be such a threat).

   b.   <u>The Court Finds, by a Preponderance of the Evidence, that Glasgow Would Pose a Flight Risk if Released Pending Trial</u>

Even if Glasgow's release would not pose a danger to the public, the Bail Reform Act would still require his pre-trial detention. Given the severity of the punishment Glasgow faces if convicted, the strong weight of the evidence against him, and his past refusal to comply with a court-ordered condition that he not possess firearms and ammunition, the Court finds by a

---

[6] At the hearing, Glasgow's counsel noted that Judge Ketanji Brown Jackson released one of Glasgow's co-defendants (Devon Dabney) pending trial after finding that the Government had not established his dangerousness by clear and convincing evidence. *See* 20-cr-27-KBJ, ECF No. 32. The Bail Reform Act inquiry, however, is "highly dependent on the specific facts and circumstances of each case." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). And unlike Glasgow, co-defendant Dabney's alleged participation in the drug-trafficking conspiracy was a minor "one-off incident." ECF No. 32 at 7. During a controlled buy from co-defendant Tyree Marshall, Dabney "carr[ied] the package [of fentanyl] out of the residence and to the waiting officer." *Id.* Additionally, unlike Glasgow's past refusal to comply with conditions of pre-trial release on his pending firearm charge, co-defendant Dabney previously demonstrated his "ability to follow conditions of supervised release" for a charge that was later dropped. *Id.* at 6–7. Thus, because Glasgow played a more significant role in the alleged drug-trafficking conspiracy than Dabney, and because Glasgow previously violated his conditions of pre-trial release by possessing a weapon, the Court is unpersuaded by Glasgow's argument that he should "be released on the same conditions" as Dabney. ECF No. 117 at 8.

preponderance of the evidence that releasing Glasgow would pose a risk of flight. *See Xulam*, 84 F.3d at 442.

### i.    *Nature and Circumstances of the Offense Charged*

As explained above, Glasgow has been charged with a serious narcotics offense. If convicted of the conspiracy charge, Glasgow will be sentenced to serve *at least* ten years in prison. *See* 21 U.S.C. § 841(b)(1)(A)(vi); *see id.* at § 846 (providing that "any person who . . . conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy"). At most, he could serve life. *Id.* at § 841(b)(1)(A)(vi). The severity of this potential sentence creates a strong incentive to flee.

The circumstances of the offense charged also indicate that Glasgow has the means to flee if released. Evidence proffered by the Government shows that Glasgow has access to considerable amounts of cash despite being unemployed. In August 2020, Glasgow had access to more than $30,000 in cash. ECF No. 122 at 8. And when he was arrested in March 2021 (still unemployed) officers seized $15,000 from his car. *Id.* at 9. Glasgow's financial resources indicate that he would have the means to flee from the area if released pending trial.

### ii.    *Weight of the Evidence*

Next, the strong weight of the evidence of Glasgow's guilt gives him an incentive to flee if released. As explained above, the Government has proffered evidence showing that Glasgow: (1) purchased the Infiniti Q60 in his name that was later used by his co-defendants to transport significant quantities of crack cocaine and fentanyl, (2) used suspected drug proceeds to purchase the car, and (3) was observed with his co-defendants while his co-defendants were selling drugs

in plain sight. *See* ECF No. 122 at 6–8; Gov't Proffer at Mot. Hr'g. This evidence of his participation in the drug-trafficking conspiracy further increases his risk of flight.

        *iii.*    *History and Characteristics of the Defendant*

      Finally, Glasgow's history and characteristics, considered alongside the presumption that no conditions or combination of conditions would reasonably assure Glasgow's appearance as necessary, do not mitigate his risk of flight. As noted above, the fact that Glasgow does not have a passport does not limit his risk of flight within the United States. Nor do his family ties to Washington, D.C. indicate that he would remain here if released. Glasgow has left the area in the past (he was arrested outside Reading, Pennsylvania) and the Court sees no reason to believe he will not leave again. ECF No. 122 at 9.

      In sum, after considering the relevant § 3142(g) factors, the Court finds by a preponderance of the evidence that Glasgow would flee if released pending trial.

      c.  <u>No Condition or Combination of Conditions of Release Would Reasonably Assure Glasgow's Appearance as Required or the Safety of the Community</u>

      In his motion, Glasgow proposes that he "return home and resume living with his mother under any conditions of release that the Court deems appropriate." ECF No. 117 at 6. But given the nature and circumstances of the offense charged, the Court finds that even the strictest condition of home detention would not reasonably assure the safety of the community. Notably, ordering Glasgow to remain on home detention while he awaits trial would not prevent Glasgow from financially supporting drug trafficking because he can do this from his home. Nor would it prevent him from advertising firearms and ammunition to drug dealers (or facilitating the sale of firearms to drug dealers from some third party), which he can do from home as well. *See* ECF No. 122 at 6–7 (proffering evidence that Glasgow advertised the sale of firearms and ammunition via Instagram).

Moreover, given Glasgow's past non-compliance with court-ordered conditions of pre-trial release, the Court finds that home detention—which requires the defendant's full cooperation—would not mitigate his risk of flight. *See* ECF No. 104 at 4. Because Glasgow has previously disobeyed a court-ordered condition of pre-trial supervision, the Court has little faith that he would not do so again if released pending trial.

## IV. CONCLUSION

For the reasons explained above, the Court finds that no condition or combination of conditions of pre-trial release would reasonably assure Glasgow's appearance as required or the safety of the community. *See* 18 U.S.C. § 3142(f). The Court will thus **DENY** his motion for pre-trial release, ECF No. 117, by separate Order.

Date: June __11__, 2021

Hon. Royce C. Lamberth
United States District Judge